**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **44 HUMMELSTOWN ASSOCIATES,** | : | |
| **LLC,** | : | **No. 1:20-cv-02319** |
| **Plaintiff** | : | |
| | : | **(Judge Kane)** |
| **v.** | : | |
| | : | |
| **AMERICAN SELECT INSURANCE** | : | |
| **COMPANY,** | : | |
| **Defendant** | : | |

## MEMORANDUM

Plaintiff 44 Hummelstown Associates, LLC ("Plaintiff") commenced this action on December 10, 2020, alleging that Defendant American Select Insurance Company ("Defendant") improperly denied insurance coverage for losses sustained due to the COVID-19 pandemic and related governmental orders. (Doc. No. 1.) Presently before the Court is Defendant's motion to dismiss (Doc. No. 16) Plaintiff's amended complaint (Doc. No. 12) pursuant to Federal Rule of Civil Procedure 12(b)(6). Having been fully briefed (Doc. Nos. 19-21), Defendant's motion (Doc. No. 16) is ripe for disposition. For the reasons that follow, the Court will grant the motion.

## I.    BACKGROUND[1]

### A.    Factual Background and Procedural History

Plaintiff is the owner and operator of a hotel in Hummelstown, Pennsylvania, known as Comfort Suites Hummelstown (the "Covered Property" or "Property"). (Doc. No. 12 ¶ 1.) In

---

[1] This background is drawn from the allegations in Plaintiff's complaint, which the Court has accepted as true, as well as exhibits attached to the complaint and matters of public record. See Lum v. Bank of Am., 361 F.3d 217, 221 n.3 (3d Cir. 2004); see also Phillips v. Cty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008). Many of Plaintiff's allegations consist of either conclusory assertions or legal arguments concerning the construction of the insurance contracts pursuant to which Plaintiff now seeks relief. As to any purely legal arguments, the Court has relegated those to its discussion concerning the merits of Plaintiff's claims unless otherwise necessary for context.

July 2019, Plaintiff and Defendant entered into an insurance contract pursuant to which Plaintiff purchased a one-year, "all-risk" commercial insurance policy ("Policy") from Defendant. (Id. ¶¶ 2, 16.) Under the Policy, which the parties renewed in July 2020,[2] Defendant agreed to "pay for direct physical loss of or damage to [the] Covered Property . . . caused by or resulting from any Covered Cause of Loss," which the Policy defines as "[d]irect physical loss unless the loss is excluded or limited" elsewhere in the Policy. (Id. ¶¶ 2, 17, 24; see Doc. No. 12-1 at 23.) In other words, the Policy insures against all non-excluded losses.

In March 2020, the World Health Organization declared COVID-19 a global pandemic (Doc. No. 12 ¶ 43), and Pennsylvania Governor Tom Wolf proclaimed the existence of a disaster emergency throughout the Commonwealth (id. ¶ 68; see Doc. No. 12-1 at 363-64). On March 19, 2020, Governor Wolf issued an order prohibiting any "person or entity [from] . . . operat[ing] a place of business in the Commonwealth that is not a life[-]sustaining business . . . ." (Doc. No. 12-1 at 367.) Life-sustaining businesses—including hotels and other accommodations—were permitted to remain open if they "follow[ed], at a minimum, the social distancing practices and other mitigation measures defined by the Centers for Disease Control to protect workers and patrons." (Id. at 367-68, 373.) The Governor then issued two stay-at-home orders: the first, dated March 23, 2020, ordered residents of several counties to stay at home; the second, dated April 1, 2020, extended the first stay-at-home order to apply to all individuals residing in the Commonwealth. (Doc. No. 12 ¶¶ 70-71; see Doc. No. 12-1 at 375, 378.)

Plaintiff alleges that it sustained business income losses and incurred additional expenses

---

[2] Although there are two insurance policies at issue (the first in effect from July 2019 to July 2020, and the second in effect from July 2020 to July 2021), consistent with Plaintiff's use of the term "Policy" in the amended complaint (Doc. No. 12 at 4 n.1), the Court will refer to both policies simply as the "Policy" herein.

due to COVID-19 and the restrictions imposed by Governor Wolf's orders, because of which Plaintiff allegedly "lost full use, or suffered limited use, of the physical space of the Covered Property." (Doc. No. 12 ¶¶ 78-80.) Plaintiff asserts that the "actual or suspected presence of COVID-19," or the risk of the virus's presence, precludes or limits the use of its hotel. (Id. ¶¶ 87-88.)[3] Referencing the "COVID-19 Effect," Plaintiff alleges that it sustained losses because of "[s]ocial anxiety over public health and society's change in perception that indoor establishments are unsafe due to COVID-19." (Id. ¶¶ 63-65.) Because of COVID-19 and Governor Wolf's orders, Plaintiff allegedly closed the portion of its business that is "non-life sustaining." (Id. ¶ 82.) According to Plaintiff, it was forced to "close the doors" to the Covered Property, which COVID-19 rendered unsafe, uninhabitable, damaged, and unfit for use as a hotel. (Id.)

At some point in March or early April 2020, Plaintiff submitted a claim to Defendant under the Policy to recover for losses stemming from the "presence of COVID-19 and the [Governor's] orders." (Id. ¶¶ 90-92.) Defendant denied Plaintiff's claim on April 13, 2020. (Id. ¶ 93.) Plaintiff then commenced the instant action against Defendant, along with Westfield Insurance Company ("Westfield"), asserting two forms of relief: (1) a declaration under the Declaratory Judgment Act, 8 U.S.C. § 2201(a), that the losses and additional expenses Plaintiff purportedly sustained and continues to sustain are covered by the Policy; and (2) damages for breach of contract arising from Defendant's denial of coverage. (Doc. No. 1.) After the parties stipulated to terminate Westfield as a defendant (Doc. No. 7), Plaintiff filed the operative amended complaint (Doc. No. 12), which Defendant now moves to dismiss (Doc. No. 16).

---

[3] Plaintiff does not specifically allege what physical limitations were imposed by the Governor's orders, the risk of COVID-19's presence, or COVID-19's actual presence. The amended complaint is silent as to the existence or impact of any government requirements to reduce capacity and does not allege any instances of COVID-19 in or around the Covered Property.

**B.     The Policy**

Plaintiff asserts that it is entitled to coverage under the Policy's "Business Income,"

"Extra Expense," and "Civil Authority" provisions.  (Doc. Nos. 12, 12-1.)  Regarding Business

Income coverage, the Policy provides, in pertinent part, as follows:

> [Defendant] will pay for the actual loss of Business Income [Plaintiff] sustains due
> to the necessary suspension of [Plaintiff's] "operations" during the "period of
> restoration[.]"  The suspension must be caused by direct physical loss of or damage
> to property at the described premises.  The loss or damage must be caused by or
> result from a Covered Cause of Loss . . . .

 (Doc. No. 12-1 at 23.)[4]  A "suspension" occurs when there is a "partial slowdown or complete

cessation of [] business activities" or, if Business Income coverage applies, "a part or all of the

described premises is rendered untenantable . . . ." (<u>Id.</u> at 28.)  The "period of restoration" begins

no later than 72 hours after "the time of the direct physical loss or damage" and ends on the

earlier of two dates: (1) the "date when the property at the described premises should be repaired,

rebuilt or replaced with reasonable speed and similar quality"; or (2) the "date when business is

resumed at a new permanent location."  (<u>Id.</u> at 56-57.)  In addition to lost income and related

operating expenses, the Policy provides for Extra Expense coverage, which covers additional

expenses incurred during the period of restoration that Plaintiff would not have incurred but for

the "direct physical loss or damage." (<u>Id.</u> at 30.)

Civil Authority coverage is implicated when a civil authority's actions preclude access to

the area surrounding the Covered Property on account of damage to nearby property.  As to this

area of coverage, the Policy provides as follows:

> When a Covered Cause of Loss causes damage to property other than property at
> the described premises, [Defendant] will pay for the actual loss of Business Income
> [Plaintiff] sustains and necessary Extra Expense caused by [an] action of [a] civil

---

[4] As indicated, <u>supra</u>, "Covered Cause of Loss" means a "[d]irect physical loss unless the loss is
excluded or limited . . . ."  (<u>Id.</u> at 24.)

authority that prohibits access to the described premises, provided that both of the following apply:

> (1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and

> (2) The action of [the] civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

(Id. at 31-32.)

As Plaintiff notes in its amended complaint, in addition to the above provisions under which it claims coverage, the Policy provides for certain "[e]xclusions," including what is commonly referred to as a "Virus Exclusion," which excludes from the Policy's scope any loss or damage caused directly or indirectly by "[a]ny virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease." (Id. at 40, 42; see Doc. No. 12 ¶ 54.) The Virus Exclusion, like the other exclusions enumerated in the Policy, applies "whether or not the loss event results in widespread damage or affects a substantial area" and "regardless of any other cause or event that contributes concurrently or in any sequence to the loss." (Doc. No. 12-1 at 40.)

## II. LEGAL STANDARD

Federal notice and pleading rules require the complaint to provide the defendant notice of the claim and the grounds upon which it rests. See Phillips v. Cty. of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008). When reviewing the sufficiency of a complaint pursuant to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept as true all material allegations in the complaint and all reasonable inferences that can be drawn from them, viewed in the light most favorable to the plaintiff. See In re Ins. Brokerage Antitrust Litig., 618

F.3d 300, 314 (3d Cir. 2010).  However, the Court need not accept legal conclusions proffered as factual allegations.  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  Rather, a civil complaint must "set out 'sufficient factual matter' to show that the claim is facially plausible." See Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

Consistent with the Supreme Court's rulings in Twombly and Iqbal, the Third Circuit has identified three steps a district court must take when determining the sufficiency of a complaint under Rule 12(b)(6): (1) identify the elements a plaintiff must plead to state a claim; (2) identify any conclusory allegations contained in the complaint "not entitled" to the assumption of truth; and (3) determine whether any "well-pleaded factual allegations" contained in the complaint "plausibly give rise to an entitlement to relief."  See Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010) (citation and quotation marks omitted).  A complaint is properly dismissed where the factual content in the complaint does not allow a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."  See Iqbal, 556 U.S. at 678.

## III.  DISCUSSION

Both Plaintiff's claim for a declaratory judgment and its claim for breach of contract converge on a single issue: whether Plaintiff has plausibly alleged that its purported business income losses and additional expenses resulting from COVID-19 and Governor Wolf's orders are covered under the terms of the Policy.[5]  Because the Court has jurisdiction based on diversity

---

[5]  In seeking relief under the Declaratory Judgment Act, Plaintiff must plead and ultimately prove that the losses and expenses it allegedly sustained fall within the scope of the Policy's coverage as provided for in the underlying insurance contracts.  In seeking damages for breach of contract under Pennsylvania law, Plaintiff must plead and prove the following elements: (1) "the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages."  See Key Consol. 2000, Inc. v. Troost, 432 F. Supp. 2d 484, 487 (M.D. Pa. 2006) (citing Corestates Bank N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super.

and amount in controversy pursuant to 28 U.S.C. § 1332, and neither party has argued to the contrary, the Court applies substantive Pennsylvania law.

**A.      Applicable Legal Standard**

Under Pennsylvania law, an "insured bears the initial burden to make a <u>prima</u> <u>facie</u> showing that a claim falls within the policy's grant of coverage." <u>See</u> <u>State Farm Fire & Cas.</u> <u>Co. v. Est. of Mehlman</u>, 589 F.3d 105, 111 (3d Cir. 2009) (applying Pennsylvania law). If the insured meets that burden, "the insurer then bears the burden of demonstrating that a policy exclusion excuses the insurer from providing coverage if the insurer contends that it does." <u>See</u> <u>id.</u> Courts interpreting provisions of insurance policies must give effect to their "clear and unambiguous" language. <u>See</u> <u>Med. Protective Co. v. Watkins</u>, 198 F.3d 100, 103 (3d Cir. 1999) (applying Pennsylvania law). Policy provisions that are "reasonably susceptible to more than one interpretation" are ambiguous. <u>See</u> <u>id.</u> (internal quotation marks omitted) (quoting <u>McMillan</u> <u>v. State Mut. Life Assur. Co.</u>, 922 F.2d 1073, 1075 (3d Cir.1990)). "In order to determine whether a term or language in a policy provision is ambiguous, the term or language must be considered in the context of the entire policy." <u>Madison Const. Co. v. Harleysville Mut. Ins. Co.</u>, 678 A.2d 802, 805 (Pa. Super. 1996), <u>aff'd</u>, 735 A.2d 100 (Pa. 1999).

**B.      Arguments of the Parties**

In moving to dismiss Plaintiff's amended complaint, Defendant argues that the Policy does not cover Plaintiff's alleged losses for three reasons: (1) the Covered Property "did not experience a direct physical loss"; (2) "no nearby property experienced a direct physical loss that

---

1999)). The success of Plaintiff's breach of contract claim therefore turns on whether Plaintiff is entitled to a declaration that its losses are covered under the Policy. <u>Cf.</u> <u>Trustees of Univ. of Pennsylvania v. Lexington Ins. Co.</u>, 815 F.2d 890, 896 (3d Cir. 1987) (noting that "[c]onstruction of an insurance policy, like construction of any contract, is a matter of law so long as a court may fairly read it without ambiguity").

triggered a civil authority order that prohibited access to [the Property]"; and (3) the "Policy's Virus Exclusion plainly bars coverage." (Doc. No. 19 at 12.) Defendant maintains that Plaintiff must allege "some nexus" to "connect the income loss and extra expense with [the] [P]roperty's physical condition" in order to invoke coverage under the Policy's Business Income and Extra Expense provisions. (Id.) Defendant contends that Plaintiff has "plead[ed] only intangible economic losses such as reduced patronage due to the virus and resulting orders." (Id. at 13.) Regarding the Civil Authority provision, Defendant submits that the Policy "provides coverage only when a nearby property experiences a direct physical loss causing a civil authority to issue an order prohibiting access to the insured's property." (Id.) According to Defendant, Plaintiff has not pleaded any allegations bringing its claims within this coverage. (Id.)

Plaintiff advances several counter arguments. Plaintiff first argues that it has "clearly alleged direct physical loss of, or damage to, the insured property" as is required to trigger Business Income and Extra Expense coverage. (Doc. No. 20-1 at 16.) Plaintiff submits that the Policy's requirement that there be "direct physical loss of or damage to" the Covered Property is "ambiguous and must be interpreted to favor [Plaintiff]." (Id. at 17.) Interpreting the Policy as such, Plaintiff asserts that a covered loss "may be [either] physical loss or physical damage," and that an "actual physical alteration of the covered property is not required." (Id. at 18.) Because Defendant included a Virus Exclusion in the Policy, Plaintiff argues that Defendant has conceded that "viruses cause physical loss or damage." (Id. at 18-19.) Given that coverage can be based on "physical loss," Plaintiff asserts that "Defendant incorrectly asserts that physical damage is required before Business Income and Extra Expense Coverage applies." (Id. at 19-26.) Plaintiff further contends that it can recover for "physical damage" even "where there [i]s no structural damage, but merely a perceived damage." (Id. at 27.)

Separately, Plaintiff asserts that it has pleaded a plausible claim for Civil Authority coverage under the Policy because Governor Wolf's orders prohibited access to the Covered Property. (Id. at 29-33.) Plaintiff argues that "[i]t is reasonable to interpret the words 'prohibits access' to a building to encompass [] government order[s]" that direct residents to stay at home and prohibit Plaintiff from operating its business "at full capacity." (Id. at 30.) Plaintiff asserts that such orders effectively "operate as closure orders," and that "the public perception of the known dangers of COVID-19 and potential to spread during travel" caused its "hotel [to] suffer substantial losses." (Id.) On Plaintiff's reading of the Policy, there need not be a "specific prohibition of access to the premises" in order to trigger the Policy's Civil Authority coverage. (Id.) A "total pro[hibi]tion of access is not required," and it is sufficient if "an action of a civil authority effectively prevented, or forbade by authority, individuals [from] accessing the insured property in a meaningful way," according to Plaintiff. (Id.)

Concerning the Virus Exclusion, Plaintiff contends that it is unclear and ambiguous and should be interpreted in its favor. (Id. at 33.) Because the Policy does not define the term "virus," Plaintiff argues that the term "must be given its ordinary dictionary definition—which does not include a 'pandemic.'" (Id.) It is Plaintiff's contention that an "ordinary virus, as contemplated by the [P]olicy [], impacts only those persons it directly infects," whereas "a pandemic triggers a wide variety of measures designed to contain the virus, impacting people and properties that the virus itself never reaches." (Id.) Plaintiff notes that other insurance companies' policies specifically include "pandemic" in their exclusions. (Id. at 34 (citing Meyer Natural Foods, LLC v. Liberty Mutual Fire Ins. Co., 218 F. Supp. 3d 1034, 1038 (D. Neb. 2016).) In any event, Plaintiff further argues that the doctrine of regulatory estoppel bars Defendant from invoking the Virus Exclusion because Defendant "misled state insurance

regulators in seeking [the adoption of] the Virus Exclusion." (Id. at 37.)[6]

Even assuming the Policy "appears to preclude coverage," Plaintiff submits that its reasonable expectations of coverage under the Policy should "supersede [] language [in the Policy] which might otherwise deny coverage." (Id. at 39 (citing UPMC Health Sys. v. Metro. Life Ins. Co., 391 F.3d 497, 502 (3d Cir. 2004) (noting that, under Pennsylvania's reasonable expectations doctrine, "the 'reasonable expectations of the insured is the focal point of the insurance transaction . . . regardless of the ambiguity, or lack thereof, inherent in a given set of documents'" (quoting Collister v. Nationwide Life Ins. Co., 388 A.2d 1346, 1353 (Pa. 1978)) (alterations in original))).)

## C. Whether Plaintiff Has Stated a <u>Prima</u> <u>Facie</u> Claim for Coverage under the Policy's Provisions

Upon consideration of the allegations in the amended complaint, the terms of the Policy, the parties' arguments, and the applicable law, the Court finds that Plaintiff has failed to allege a plausible claim to coverage under the Policy. In doing so, this Court joins the scores of courts that have rejected commercial insurance claims predicated on similar or identical allegations and policy provisions. See, e.g., Kahn v. Pennsylvania Nat'l Mut. Cas. Ins. Co., No. 1:20-cv-781, 2021 WL 422607 (M.D. Pa. Feb. 8, 2021) (dismissing a claim for a declaration of coverage

---

[6] As to this contention, Plaintiff asserts that the Insurance Services Office ("ISO") and American Association of Insurance Services ("AAIS"), "on behalf of insurers, misled state insurance regulators in seeking the adoption of the Virus Exclusion." (Doc. No. 20-1 at 37.) The ISO and AAIS did so, Plaintiff alleges, by "securing approval for the Virus Exclusion" based on the false representation that property policies never covered "loss, cost or expense caused by disease-causing agents" and were never intended to do so. (Id.) Plaintiff alleges that, contrary to this misrepresentation, courts had previously found that "property insurance policies covered claims involving disease-causing agents." (Doc. No. 12 ¶¶ 120-21.) As a result of the ISO's and AAIS's allegedly false representations, Plaintiff asserts that Defendant was permitted to include a Virus Exclusion in the policy without a commensurate reduction in premiums "to balance a reduction in coverage." (Id. ¶ 122.)

under an all-risk insurance policy for the insured's failure to plausibly allege physical loss of or damage to the covered premises stemming from COVID-19 and Governor Wolf's orders); 1 S.A.N.T., Inc. v. Berkshire Hathaway, Inc., No. 2:20-cv-862, 2021 WL 147139 (W.D. Pa. Jan. 15, 2021) (same); ATCM Optical, Inc. v. Twin City Fire Ins. Co., No. 20-cv-4238, 2021 WL 131282 (E.D. Pa. Jan. 14, 2021) (same); The Scranton Club v. Tuscarora Wayne Mut. Group, Inc., No. 20-cv-2469, 2021 WL 454498, at *10 (Pa. Com. Pl. Jan. 25, 2021) (same).

### 1. Business Income and Extra Expense Coverage

To establish a prima facie claim for coverage under the Policy's Business Income and Extra Expense provisions, Plaintiff must plausibly allege that it suffered "direct physical loss of or damage to" the Covered Property. (Doc. No. 12-1 at 20.) Before considering whether Plaintiff's allegations state a plausible claim for coverage, the Court must determine whether the relevant terms of the Policy are clear and unambiguous. See, e.g., Ready Food Prods., Inc. v. Great N. Ins. Co., 612 A.2d 1385, 1387 (Pa. Super. 1992) (noting that "[t]he threshold determination of whether a writing is 'ambiguous' necessarily lies with the court"). Plaintiff argues that the disputed language "direct physical loss of or damage to" is ambiguous—and that the Court should construe the language in Plaintiff's favor to deny Defendant's motion to dismiss—for three reasons: (1) the Policy "does not define the terms 'loss' or 'damage'"; (2) the "language sets up a false premise by conflating the words 'loss' and 'damage'"; and (3) use of the disjunctive "or" between "physical loss" and "damage" indicates that a covered loss "may be physical loss or physical damage" such that "actual physical alteration of the [Covered Property] is not required." (Id. at 17-18 (emphasis in original).)

Plaintiff's attempt to inject ambiguity into the Policy is unavailing. A policy term is not "ambiguous merely because it is not defined in the policy." See Wall Rose Mut. Ins. Co. v.

Manross, 939 A.2d 958, 965 (Pa. Super. 2007); see also Telecommunications Network Design v. Brethren Mut. Ins. Co., 5 A.3d 331, 336-37 (Pa. Super. 2010) (noting that the mere presence of an undefined policy term that "can imply several meanings is insufficient to create ambiguity"). Nor does ambiguity "exist simply because the parties disagree on the proper construction to be given a particular policy provision."  See Neuhard v. Travelers Ins. Co., 831 A.2d 602, 605 (Pa. Super. 2003) (citing Tyler v. Motorists Mutual Ins. Co., 779 A.2d 528, 531 (Pa. Super. 2001)). Rather, when a "policy . . . neglects to define a term, the Court will read it in the plain and generally accepted meaning of the term," see 1 S.A.N.T., 2021 WL 147139, at *5, mindful that "[w]ords of common usage in an insurance policy are to be construed in their natural, plain, and ordinary sense, and [that courts] may inform [their] understanding of the terms by considering their dictionary definitions," see Madison Const. Co., 735 A.2d at 108.

The phrase "direct physical loss of or damage to" contains four key terms, "direct," "physical," "loss," and "damage," none of which is defined within the Policy.  The Court must therefore consider their generally accepted meanings.  "Direct" means "stemming immediately from a source" and is "marked by [the] absence of an intervening agency, instrumentality, or influence."  See Direct, Merriam-Webster's Collegiate Dictionary (10th ed. 1997).  "Physical" means "of, relating to, or involving material things; pertaining to real, tangible objects."  See Physical, Black's Law Dictionary (11th ed. 2019).  "Loss" means "destruction, ruin," the "act of losing possession," and "[d]amage" means "loss or harm resulting from injury to person, property, or reputation."  See Damage, Loss, Merriam-Webster's Collegiate Dictionary (10th ed. 1997).[7]  Considering these terms in context, the Court agrees with Plaintiff that the phrase "direct

---

[7] "Direct loss" means "[a] loss that results immediately and proximately from an event."  See Direct Loss, Black's Law Dictionary (11th ed. 2019).

physical loss of or damage to" requires either "direct physical loss" or "direct physical damage." This is so because the terms "direct" and "physical" modify both "loss" and "damage."  See Frank Van's Auto Tag, LLC v. Selective Ins. Co. of the Se., No. 20-cv-2740, 2021 WL 289547, at *5 (E.D. Pa. Jan. 28, 2021); see also, e.g., Kahn, No. 2021 WL 422607, at *5.

As to "physical loss" and "physical damage," in a leading and oft-quoted insurance treatise, it is observed that the requirement in an insurance policy "that [a covered] loss be 'physical' . . . is widely held to exclude [intangible or incorporeal] losses . . . ."  See 10 Couch on Insurance § 148:46.  It follows that a "detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property" does not qualify as "physical" loss or damage. See id.  Under this rationale, courts have construed policies insuring against "direct physical loss" or "direct physical damage" to require "actual, demonstrable harm of some form to the [insured] premises itself, rather than forced closure of the premises for reasons extraneous to the premises themselves, or adverse business consequences that flow from such closure."  See, e.g., Hair Studio 1208 v. Hartford Underwriters Ins. Co., No. 20-cv-2171, 2021 WL 1945712, at *6 (E.D. Pa. May 14, 2021) (internal quotation marks omitted). There must be "some tangible issue with the physical structure of the business's premises," Kahn, 2021 WL 422607, at *6, as well as a "direct nexus between" the tangible issue and the alleged loss, see Frank Van's Auto Tag, LLC, 2021 WL 289547, at *5.

This construction of the phrase "direct physical loss of or damage to" is supported by the Policy's broader framework.  The Business Income provision covers losses sustained during a "period of restoration," which itself begins with the commencement of some physical repair, rebuilding, or replacement, and ends when such physical restoration is complete.  "The language of th[e] ['period of restoration'] provision strongly implies that the Policy was only intended to

cover business losses sustained over a period when the property had some <u>physical or structural issue</u> that prevented the business from operating." <u>See</u> <u>Kahn</u>, 2021 WL 422607, at *6 (emphasis added); <u>see also</u> <u>Indep. Rest. Grp. v. Certain Underwriters at Lloyd's, London</u>, No. 20-cv-2365, 2021 WL 131339, at *7 (E.D. Pa. Jan. 14, 2021) (noting that "coverage for actual or threatened coronavirus contamination [would not] make sense in connection with the [p]eriod of [r]estoration language, which ties business income coverage eligibility to the period during which the property can be 'repaired, rebuilt, or replaced'"). To hold otherwise would render the "period of restoration" provision superfluous, <u>see, e.g.</u>, <u>Kahn,</u> 2021 WL 422607, at *6, and Pennsylvania's "rules of construction do not permit words in a contract to be treated as surplusage . . . if any reasonable meaning consistent with the other parts can be given to it," <u>see</u> <u>Clarke v. MMG Ins. Co.</u>, 100 A.3d 271, 276 (Pa. Super. 2014) (internal quotation marks omitted) (ellipses in original).

Applying the unambiguous terms of the Policy to Plaintiff's allegations, the Court finds that Plaintiff has failed to state a plausible claim for coverage under the Business Income and Extra Expense provisions. Stripped of conclusory assertions and legal arguments, Plaintiff's allegations simply do not support its claim that the COVID-19 pandemic and resulting governmental orders caused "direct physical loss of or damage to" the Covered Property. What Plaintiff has plausibly alleged is that the combination of the circumstances surrounding COVID-19 and Governor Wolf's orders negatively impacted its hotel by decreasing patronage, but such allegations are insufficient to trigger coverage. In short, none of the allegations in the amended complaint plausibly supports Plaintiff's contention that COVID-19 and the Governor's orders "h[ad] something to do with the <u>physical condition</u> of the premises." <u>See</u> <u>Moody v. Hartford Fin. Grp., Inc.</u>, No. 20-cv-2856, 2021 WL 135897, at *5 (E.D. Pa. Jan. 14, 2021) (emphasis

added).

Instructive in this regard is <u>Port Authority of New York & New Jersey v. Affiliated FM Insurance Co.</u>, 311 F.3d 226 (3d Cir. 2002), a decision of the United States Court of Appeals for the Third Circuit upon which numerous courts have relied in dismissing similar claims.[8]  That case presented the issue of whether an all-risk policy that insured against "physical loss or damage" covered losses stemming from the presence of asbestos within the insured's buildings. <u>See</u> <u>id.</u> at 230.  Drawing support from the aforementioned insurance treatise, <u>see</u> <u>supra</u>, the Third Circuit expounded on the meanings of "physical damage" and "physical loss":

> In ordinary parlance and widely accepted definition, <u>physical damage</u> to property means a distinct, demonstrable, and physical alteration of its structure.  Fire, water, smoke and impact from another object are typical examples of physical damage from an outside source that may demonstrably alter the components of a building and trigger coverage. Physical damage to a building as an entity by sources unnoticeable to the naked eye must meet a higher threshold . . . .
>
> [T]he policies [in this case] cover <u>physical loss</u>, as well as damage.  When the presence of large quantities of asbestos in the air of a building is such as to make the structure uninhabitable and unusable, then there has been a distinct loss to its owner.  However, <u>if asbestos is present in components of a structure, but is not in such form or quantity as to make the building unusable, the owner has not suffered a loss</u>.  The structure continues to function—it has not lost its utility.  The fact that the owner may choose to seal the asbestos or replace it with some other substance as part of routine maintenance does not bring the expense within first-party coverage.

<u>See</u> <u>id.</u> at 235-236 (internal quotation marks, citation, and footnote omitted) (emphasis added).

The Third Circuit agreed with the district court that there could be no physical loss or damage

---

[8]  <u>Port Authority</u> was an appeal from the grant of a summary judgment motion, but federal courts that have considered similar coronavirus-related insurance claims have relied upon the Third Circuit's reasoning to dismiss claims at the pleading stage.  <u>See, e.g.</u>, <u>Kahn</u>, 2021 WL 422607, at *9.  Additionally, although <u>Port Authority</u> involved New Jersey and New York substantive law, the Third Circuit has since "predict[ed] that the Pennsylvania Supreme Court would adopt a similar principle as [the court] did in <u>Port Authority</u>."  <u>See</u> <u>Motorists Mut. Ins. Co. v. Hardinger</u>, 131 F. App'x 823, 826 (3d Cir. 2005) (unpublished).

absent "an actual release of asbestos fibers" that "resulted in contamination of the property such that its function [wa]s nearly eliminated or destroyed, or the structure [wa]s made useless or uninhabitable . . . ." See id. at 236.

Here, Plaintiff's non-conclusory allegations do not suggest that the "function" of the Covered Property was "nearly eliminated or destroyed" or "made useless or uninhabitable." See id. To the contrary, the amended complaint and attached exhibits reflect that the Covered Property was never ordered closed, that hotels were excluded from the Governor's closure order and conditionally permitted to continue operations, and that neither COVID-19 nor the Governor's orders themselves touched upon the Property's physical form in any tangible way. Plaintiff's allegations of the risks, stigma, and ubiquity of COVID-19 bear no relation to the structure of the Covered Property and in no way suggest that the hotel became wholly defunct or was otherwise reduced to uselessness or uninhabitability. Insofar as the pandemic prompted individuals to refrain from patronizing certain businesses, the consequences of that phenomenon are too removed from the Covered Property itself to be capable of establishing any "direct physical loss" or "direct physical damage," particularly given that "direct" connotes an immediacy of consequences flowing from the cause of the losses.

Plaintiff asserts that the enclosed nature of its hotel's indoor space makes it particularly vulnerable to the spread and risk of COVID-19, but Plaintiff has not alleged any contamination from the virus, nor, for that matter, any specific impact on the Covered Property aside from COVID-19's far-reaching impact on all humans and business relations generally. A similar argument was advanced in Kessler Dental Associates, P.C. v. Dentists Insurance Co., No. 2:20-cv-03376, 2020 WL 7181057 (E.D. Pa. Dec. 7, 2020), where the insured alleged that it sustained direct physical loss or damage because its business was "conducted in an enclosed building,"

making it susceptible to "being or becoming contaminated" by COVID-19. See id., at *4. The court held that the allegations amounted to "indirect 'general threat[s] of future damage' and do not demonstrate 'physical damage.'" See id. (quoting Port Auth. of New York & New Jersey, 311 F.3d at 235).[9] For all these reasons, Plaintiff's allegations do not establish a prima facie claim for Business Income or Extra Expense coverage under the Policy.

### 2.    Civil Authority Coverage

Equally unavailing is Plaintiff's contention that it has adequately pleaded a claim for coverage under the Policy's Civil Authority provision. As recited, supra, coverage under this provision is triggered only upon a showing that: (1) a Covered Cause of Loss caused damage to property nearby the Covered Property; (2) Plaintiff sustained losses due to the action of a civil authority that prohibits access to the Covered Property; (3) the civil authority's action prohibiting access to the Covered Property resulted from the damage to the nearby property; and (4) the civil authority's action is taken in response to "dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage," or the action "is taken to enable a civil authority to have unimpeded access to the damaged property." (Doc. No. 12-1 at 31-32.)

A review of these conditions to coverage makes abundantly clear that Plaintiff has failed to plead allegations sufficient to state a claim for relief under the Policy's Civil Authority

---

[9] Further, as one court has noted, "[b]ecause surfaces [contaminated by COVID-19] would merely need to be cleaned, contamination would not meet the requirements under Port Authority because presence of the virus would not render the property useless or uninhabitable or nearly eliminate or destroy its functionality." See Moody, 2021 WL 135897, at *6; see also, e.g., Indep. Rest. Grp., 2021 WL 131339, at *7 (noting the insured's concession that "contaminated surfaces can be cleaned and sanitized"); Rococo Steak, LLC v. Aspen Specialty Ins. Co., No. 8:20-cv-2481, 2021 WL 268478, at *4 (M.D. Fla. Jan. 27, 2021) (holding, under Florida law, that an insured "cannot allege direct physical loss by claiming its property was superficially contaminated with COVID-19 particles").

provision.  Plaintiff has not alleged that a Covered Cause of Loss caused damage to "property other than" the Covered Property.  See, e.g., Kahn, 2021 WL 422607, at *6 (holding that the insured did not allege loss or damage to another property caused by a covered cause of loss); Windber Hosp. v. Travelers Prop. Cas. Co. of Am., No. 3:20-cv-80, 2021 WL 1061849, at *5 (W.D. Pa. Mar. 18, 2021) (dismissing a claim for civil authority coverage, noting that "[t]here was no[] damage to any surrounding properties, there was only the Governor's [o]rders and the COVID-19 pandemic").  Moreover, the amended complaint and its exhibits demonstrate that Governor Wolf never prohibited access to the Covered Property or any adjacent areas.  Even if the Governor's orders did prohibit access to the Covered Property and surrounding areas, Plaintiff has not alleged that the orders were issued in response to "some dangerous physical condition at [a] nearby premise[s]."  See Kessler Dental Assocs., P.C., 2020 WL 7181057, at *4.  Nor has Plaintiff alleged that the Governor's orders constituted "action [] taken to enable a civil authority to have unimpeded access to the damaged property."  (Doc. No. 12-1 at 32.)  The Court therefore concludes that Plaintiff has failed to state a claim for entitlement to Civil Authority coverage under the Policy.

### D.    Whether the Virus Exclusion Applies

Because Plaintiff has not pleaded allegations sufficient to bring its alleged losses within the scope of the Policy, the Court need not address the parties' contentions concerning the applicability of the Virus Exclusion.  However, given that the Court must consider whether to grant Plaintiff leave to file a second amended complaint, see infra, the Court will briefly address the application of the Virus Exclusion as applied to Plaintiff's allegations.  To reiterate, Plaintiff asserts that the Virus Exclusion is ambiguous and only covers losses sustained due to viruses, not pandemics, and that the doctrine of regulatory estoppel bars Defendant from invoking the Virus

Exclusion altogether.  Neither argument is availing.

First, the Policy unambiguously excludes from coverage losses caused by "[a]ny virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease."  (Doc. No. 12-1 at 40, 42); see Wilson v. Hartford Cas. Co., 492 F. Supp. 3d 417, 427 (E.D. Pa. 2020) (noting that "[t]he Third Circuit and [other courts] have upheld similarly unambiguous exclusions barring coverage for losses caused by hazardous substances or microorganisms").  "There is no other way to characterize COVID-19 than as a virus which causes physical illness and distress."  Brian Handel D.M.D., P.C. v. Allstate Ins. Co., No. 20-cv-3198, 2020 WL 6545893, at *4 (E.D. Pa. Nov. 6, 2020); see also Lansdale 329 Prop, LLC v. Hartford Underwriters Ins. Co., No. 20-cv-2034, 2021 WL 1667424, at *10 (E.D. Pa. Apr. 28, 2021).  Plaintiff argues that the pandemic itself, together with the resulting social anxiety and governmental restrictions, caused harms separate and apart from the virus, but the Virus Exclusion applies "regardless of any other cause or event that contributes concurrently or in any sequence to the loss."  (Id. at 40.)

Second, Plaintiff's regulatory estoppel arguments are misplaced.  To invoke regulatory estoppel, which, "prohibits parties from switching legal positions to suit their own ends," see Sunbeam Corp. v. Liberty Mut. Ins. Co., 781 A.2d 1189, 1192 (Pa. 2001), Plaintiff must establish that Defendant "represent[ed] to a regulatory agency that new language in a policy will not result in decreased coverage" only to "assert the opposite position" in this litigation.  See Brian Handel D.M.D., P.C., 2020 WL 6545893, at *4.  Plaintiff argues that the ISO and AAIS sought approval of the Virus Exclusion by misrepresenting to state regulators that commercial property policies were not intended to cover virus-related losses.  However, Defendant's current position—in essence, that "the virus exclusion eliminates coverage for any damage or loss as a

result of the causes enumerated therein," see id.—is consistent with the ISO's and AAIS's position that a "virus exclusion can be helpful in clarifying that a policy does not cover losses stemming from a virus or other disease-causing agent," see Paul Glat MD, P.C. v. Nationwide Mut. Ins. Co., No. 20-cv-5271, 2021 WL 1210000, at *9 (E.D. Pa. Mar. 31, 2021). Assuming the ISO's and AAIS's statements can be imputed to Defendant, Plaintiff has not alleged that Defendant is presently embracing a view that contradicts those statements.[10] Thus, even if "Plaintiff's claimed losses fell within the grant of coverage under the Business Income or Civil Authority provisions, the Virus Exclusion would still prevent recovery." See Whiskey Flats Inc. v. Axis Ins. Co., No. 20-cv-3451, 2021 WL 534471, at *4 (E.D. Pa. Feb. 12, 2021).

### E. Whether Plaintiff's Reasonable Expectations Supersede the Policy's Terms

Finally, the Court addresses Plaintiff's contention that, even if the Policy's terms preclude relief, the Court should apply Pennsylvania's reasonable expectation doctrine to deny Defendant's motion to dismiss. "Under Pennsylvania law, in 'very limited circumstances,' the insured's reasonable expectations may prevail over the clear and unambiguous terms of the contract." See Paul Glat MD, P.C., 2021 WL 1210000, at *2 (quoting Madison Const. Co., 735 A.2d at 109). The doctrine is "intended to protect against the inherent danger, created by the nature of the insurance industry, that an insurer will agree to certain coverage when receiving the

---

[10] In a related argument, Plaintiff submits that Defendant has taken an inconsistent position by including a Virus Exclusion in the Policy, only to now assert that a virus can never cause "direct physical loss of or damage to" property. (Doc. No. 20-1 at 18-19.) According to Plaintiff, "[i]f Defendant truly believed that a virus could not cause direct physical loss, there would be no reason for the virus exclusion to be included in the Policy and Defendant would simply rely on allegations that plaintiff could not show the virus caused a loss under the policy." (Id. at 19.) As to this argument, neither Defendant nor the myriad courts that have addressed similar claims posit that a virus can never cause physical loss or damage. It is Defendant's contention that, in this particular case, Plaintiff has not plausibly alleged that COVID-19 damaged or rendered unusable the Covered Property, and the Court agrees.

insured's application, and then unilaterally change those terms when it later issues a policy." See UPMC Health Sys., 391 F.3d at 502 (citing Tonkovic v. State Farm Mut. Auto. Ins. Co., 521 A.2d 920 (Pa. 1987)).  To invoke the doctrine, the insured must plead "some affirmative action by the insurer or its agent that changed the coverage the insured purchased."  See Paul Glat MD, P.C., 2021 WL 1210000, at *2.

In relying on the reasonable expectations doctrine, Plaintiff rehashes its contentions that the Policy is ambiguous, that the Policy should be construed in its favor, and that Plaintiff expected that its alleged losses would be covered.  However, "mere assertions that a party expected coverage will not ordinarily defeat unambiguous policy language excluding coverage." See Matcon Diamond, Inc. v. Penn Nat. Ins. Co., 815 A.2d 1109, 1114-15 (Pa. Super. 2003). Although "an insurer may not make unilateral changes to an insurance policy unless it both notifies the policyholder of the changes and ensures that the policyholder understands their significance," see Bensalem Twp. v. Int'l Surplus Lines Ins. Co., 38 F.3d 1303, 1311 (3d Cir. 1994), Plaintiff does not allege that Defendant unilaterally altered the policy, see Paul Glat MD, P.C., 2021 WL 1210000, at *8 (rejecting application of the reasonable expectations doctrine where the plaintiff did not allege that the insurer had "deceived it or unilaterally changed the policy" or "wrote coverage different from what [Plaintiff] had requested").  Because the unambiguous terms of the Policy preclude coverage—and given that Plaintiff's mere expectation that its alleged losses are covered does not warrant application of the reasonable expectations doctrine—Plaintiff's arguments on this score are unavailing.

## F.    Leave to Amend

The Third Circuit has "instructed that if a complaint is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or

futie." See Phillips, 515 F.3d at 236 (citing Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002)). "An amendment is futile if the amended complaint would not survive a motion to dismiss for failure to state a claim upon which relief could be granted." Alvin v. Suzuki, 227 F.3d 107, 121 (3d Cir. 2000) (citing Smith v. NCAA, 139 F.3d 180, 190 (3d Cir. 1998), rev'd on other grounds, 525 U.S. 459 (1999)). Here, Plaintiff has already filed an amended complaint in response to Defendant's motion to dismiss the original complaint, and the allegations in neither of Plaintiff's pleadings are capable of establishing prima facie claims for relief under the Policy. Given that the clear import of Plaintiff's non-conclusory allegations is that it seeks to recover for intangible harms unrelated to the physical form of the Covered Property, the Court finds that permitting further amendment would be futile. Simply put, Plaintiff does not appear to have any plausible, factual basis upon which to invoke the Policy's coverage.

## IV.    CONCLUSION

For the foregoing reasons, the Court will grant Defendant's motion to dismiss (Doc. No. 16) and dismiss this action with prejudice. An appropriate Order follows.